111 So.2d 627

**C. W. ORR**

v.

**STATE.**

**8 Div. 290.**

Court of Appeals of Alabama.

Aug. 19, 1958.

Rehearing Denied Oct. 7, 1958.

**47**

Powell & Powell, Decatur, for appellant.

John Patterson, Atty. Gen., and Paul T. Gish, Jr., Asst. Atty. Gen., for the State.

CATES, Judge.

Orr appeals from a judgment rendered June 19, 1957, conforming to a verdict of guilt of transporting five gallons or more of "wildcat" whiskey, Code 1940, T. 29, § 187. Upon conviction, he was sentenced to five years' penal servitude.

The appeal is also, as permitted by statute (Code 1940, T. 7, § 764), from a judgment rendered August 17, 1957, overruling a motion for new trial.

The view of the evidence we must take, in the light of the verdict for the State, is substantially as follows:

On January 8, 1957, Mr. Carlos Nelson, for five and one-half years an enforcement officer of the Alcoholic Beverage Control Board, saw Orr driving a 1951 Black Chevrolet Fleetline car on a paved road (Highway 41) three miles south of Danville in Morgan County. This was about six o'clock in the morning.

Nelson, who was accompanied by another officer, Herman Sandlin, followed a car coming out of a driveway. As he put it:

> " * * * I pulled out after him and run about a mile without my lights on and as we rounded a curve three-quarters of a mile south of there, a pick-up truck came out of a side road. He passed the pick-up truck just a few feet after he came out. As I approached the pick-up, I turned my lights on and caught up with him and turned on the siren and pulled up by him. He looked back over his shoulder at me and cut it off to the left.
>
> "Q. To the left? A. Yes, sir.
>
> "Q. You mean cut in front of your car? A. Into the side of my car.
>
> "Q. He cut over toward your car?

"A. That's right. I slammed the brakes on and got behind him and kept the siren on for about a half a mile running on the left hand side of the road right near the edge. Finally, he pulled in the middle of the road and I bumped his rear bumper and he run in the ditch.

"Q. He run in the ditch? A. And the car turned around and the trunk lid flew open and two cans of whiskey were still in the trunk and two fell out in the ditch right behind his car, and I backed up and got my headlights on his car and I thought he was going to stay in, and I got out of our car and run around to the culvert, and he went out the right side door and up a bank and out through the woods.

"Q. Did you run after him? A. I did.

"Q. How far? A. About a hundred yards until I got tangled up in some vines and fell down.

"Q. Got tangled in the vines? A. Yes, sir.

"Q. His car hit the ditch and turned around? A. Yes, sir.

"Q. Did you get a good view of his car then? A. Yes, sir.

"Q. Did you see him then? A. I saw him as he went out of the car on the right hand side and up the bank. I was running in the meantime."

The illicit cargo was in four Army water ("jacket" or "GI") cans, each holding about five gallons of wildcat whiskey. Sandlin's testimony was of the same tenor and effect. Richard Hyche, a deputy sheriff, gave evidence to identify the whiskey and the containers introduced by the State as being those handed him by Nelson and Sandlin after the chase.

Orr's evidence was in the nature of alibi, part of his explanation being that he stayed the better part of the night before at Maudie Campbell's house where he last saw his car, it being gone when he got up the next morning early to go to her brother's home nearby. He and Maudie's brother, Buddy Winton, came into Hartselle later and there that evening Orr was told by a young boy he encountered on the street that his car was in the hands of the law. On January 9 he gave himself up to the sheriff.

The solicitor catechized Orr regarding his nocturnal whereabouts:

"Q. Did you tell your wife when you left home you would be gone that night? A. I didn't tell her nothing.

"Q. Didn't tell her you were going to spend the night with Maudie?

"Mr. S. Powell: We object.

"A. I ain't told her nothing.

"Q. After you got out, spending the night with Maudie, did you send her any word you were at Maudie's house? A. No, sir, I didn't send word; sho didn't."

The resolution of the conflict of the tendencies of the evidence is for the jury, and will not be disturbed on appeal except for lack of sufficiency to make a prima facie case.

Orr raises two questions on this appeal: the *first* arising out of a reference in argument by one of the solicitors to the absence of Maudie Campbell to testify for Orr; and the *second* was occasioned by a supplemental oral charge given on the morning of the second day of the trial—the jury deliberated most of the afternoon of the day before.

During argument the following occurred:

"By Mr. M. Powell: We object to the statement just made by the County Solicitor, 'Where is Mattie Campbell, if he spent the night with her and is looking the Penitentiary in the face?'

"Mr. Slate: 'Doors of the pen'.

"Mr. Powell: 'Doors in the face, where is she?' We assign as grounds,

Mattie Campbell was equally available to the State and the Defendant. We maintain that it is prejudicial error to refer to the absence of a witness that is equally available to both sides. We move to exclude that statement, and for a mistrial at this time.

"Mr. Johnson: There are certain exceptions to the rule. The court holds, by virtue of relationship, one witness is more accessible to one side than the other. I want to be frank with Your Honor. The rule to which I am referring had certain reference to the comments regarding the absence of his wife. I don't know that it would reach Mattie Campbell.

"Court: The rule is flexible with reference to that. The rule is that if the witness is peculiarly friendly to one party more than the other, that it may be commented upon that they did not have them there, but in this case, gentlemen of the jury, you will not consider the argument of the Solicitor with reference to the absence of Maudie Campbell. Maudie Campbell seems to live somewhere up around Valhermosa Springs in this county and would be available. The testimony was had about her yesterday and no process is issued for her since then, so that part of it is excluded from you, gentlemen. You will not consider it. The motion for suspension of the trial is overruled.

"Mr. Powell: We except."

██ The general rule is stated in Kissic v. State, 266 Ala. 71, 94 So.2d 202, 207, as:

"* * * It is the settled law in this State that no unfavorable inference can be drawn, and no unfavorable argument to a jury made, by counsel against a party to a cause because of the failure to call a witness to testify, when that witness is accessible to both parties, and can be introduced by and examined by either party. * * *"

However, we have here a situation similar to that discussed in Davis v. State, 259 Ala. 212, 66 So.2d 714, 717, where the court, after pointing out that the trial judge sustained objection to the solicitor's argument that the defendant put no testimony on the stand and directed the jury not consider this aspect of the trial, said:

"* * * while there was a motion for a new trial within the time prescribed by law, and that the motion was duly heard and acted upon, it did not have as a ground thereof the effect upon the jury of the alleged improper argument made by the solicitor, as hereinabove detailed. So that, for the purpose of determining whether there is reversible error with respect to it, we can only consider what we have copied hereinabove from the record.

\* \* \* \* \* \*

"* * * The cases hold that such a status, prima facie, shows an absence of reversible error. Many of those cases are cited in Broadway v. State, supra [257 Ala. 414, 60 So.2d 701], to which we add Bestor v. State, 209 Ala. 693, 96 So. 899. In the Bestor case it was emphasized that no motion for a new trial was made on that ground, but had it been done a serious question of error would have been presented. We also add Bachelor v. State, 216 Ala. 356, 113 So. 67; Stephens v. State, 250 Ala. 123(3), 33 So.2d 245.

"Our judgment is that this record does not show reversible error with respect to that matter in the light of the foregoing principles and authorities."

Orr's motion for a new trial cited some sixteen grounds, all of which, with a single exception, in varying form, went to the weight of the evidence or of the verdict (in the light of the evidence) adhering to the trial judge's instructions. Ground 11 cited as error the overruling of defendant's objections in various instances to the admission of evidence. No ground reaches or cites the judge's failure to declare a mis-

trial because of the solicitor's pointing out that Maudie Campbell was not put on the stand.

The trial judge took into account that Orr, on the first day of trial, testified as to his spending the night at Mattie (Maudie) Campbell's. Therefore, the State (even though theretofore without notice of the details of Orr's alibi) still had time to have sought her as a rebuttal witness for the second day.

■ The expression "equally available" or "accessible" connotes more than mere indifference or lack of imputed partiality as between the parties: it also includes the concept of knowledge of the purported witness' having some familiarity with the facts and being within the reach of compulsory process.

Thus, Wigmore, Evidence (3rd Ed.), § 288 (1957 Supp. p. 57), says:

"However, the term 'available' is not to be construed as meaning merely the accessibility for service of process. The determination of the question of equal availability may in a given situation involve the consideration of many factors. Such matters as one party's superior means of knowledge of the existence and identity of the witness, of the testimony that might be expected from him in the light of his previous statements, if any, with reference to the case are to be considered. It is manifest, therefore, that in passing upon this question of equal availability, the trial judge is called upon to take into account all of the attendant facts and circumstances bearing upon the situation of the witness with relation to the parties, respectively."

■■ No formal "plea" of alibi is required of a defendant: under the general issue of "not guilty" he may adduce proof of his being elsewhere to generate a reasonable doubt (or to preclude moral certainty) of his guilt, Canty v. State, 242 Ala. 589, 7 So.2d 292. Nor under our practice does he have to give advance notice of the details of his claim or of his supporting witnesses. See 15 Am.Jur., Criminal Law, § 315; Annotation, 30 A.L.R.2d 480–485.

At 23 C.J.S. Criminal Law § 1117, we find a syllabus which reads in part:

"Generally, timely corrective action by the court or offending counsel or by both is sufficient to cure the error resulting from improper conduct or remarks of counsel, unless such conduct or remarks are so prejudicial that they are obviously not cured, or unless the court's action is insufficient for such purpose. * * *"

According to Bricken, P. J., in Lowery v. State, 21 Ala.App. 352, 108 So. 351, had the trial judge overruled the defendant's motion to exclude, we should have had a violation of due process. But does the principle of the Davis case, supra, extend to this kind of argument so as to cure error or was the denial of the motion for a mistrial error because the improper argument was ineradicable?

In Jacobs v. State, 24 Ala.App. 195, 132 So. 868, the solicitor in argument asked why the defendant had not brought forth the committing magistrate as witness for him on his trial in the circuit court. The trial judge (on objection and motion to exclude) instructed the jury not to consider the argument. Denial of the defendant's motion for a mistrial was held not to be reversible error. See also dictum, Oates v. State, 38 Ala.App. 158, 79 So.2d 61, resting the resolution of the question as one of reviewing the exercise of the trial judge's discretion.

We need not lean upon the error without injury doctrine (Code 1940, T. 15, § 389, last sentence) or upon the doctrine of the lack of probable substantial injury to defendant's rights (Supreme Court Rule 45, 261 Ala. xxxvii; Code 1940, Tit. 7 Appendix).

The dictum of Mr. Justice Lawson in Bryson v. State, 264 Ala. 111, 84 So.2d 785, 787, in discussing what the defendant

claimed was a continuation of the solicitor's argument as to the defendant's failure to use a witness, reads pertinently:

"* * * Moreover, we are of the opinion that any injurious effect which the statement may have caused could have been eradicated by corrective action by the court, but the defendant did not request such action prior to making the motion to declare a mistrial."

■ Here Orr moved to exclude the remark, "Where is Mattie Campbell?" which the trial judge did after pointing out that the State had neglected to use what he considered sufficient opportunity to bring Mattie in as a rebuttal witness. The quoted dictum from the Bryson case, supra, would seem to apply here to the full extent of making the violation of due process become nonexistent or expunged because of the trial judge's curative direction to the jury. This comports with the holding in Jacobs v. State, supra.

Thus, our cases (while not permitting disparagement of alibi as a defense to the extent of implying that the burden of proof shifts) do not make the impropriety incurable. Hence, even though the question was omitted as a ground for a new trial, we could not have held the court below in error had the remark been cited in Orr's motion for new trial.

The second claim for reversal is based on an additional instruction given the jury on the reconvening of court on the morning of June 19, 1957, the third day of the trial. The case had gone to the jury the previous afternoon, and the deliberations went on until 5:00 P.M. when the trial was recessed until 9:00 o'clock the next morning.

The next morning the judge *ex mero motu* admonished the jury as to their oaths to render a verdict and that jurors should not be obstinate. The defendant excepted to the following parts of the supplemental charge:

"* * * It is true that one man or two men or three men on the jury can prevent a verdict. That ought not to obtain. * * *

and

"* * * This court expects a verdict in this case. It costs the tax-payers of this county a lot of money to try these cases and another trial would be doubly expensive. Most of the tax-payers make their money the hard way and so the tax-payers of this county expect a verdict, not an exhibition of obstinancy."

In the circumstances shown by this record we see no error in the first matter excepted to and quoted above.

Since Bushell's case (1670), Vaughan 135, a juryman may not be punished for an honest verdict: the rendering of a verdict was held by Vaughan, C. J., to be a judicial act. Upon this rock the province of the jury as the sole judges of the facts is established.

As to whether a jury may be discharged for failure to agree has been a more difficult and variously answered question. See Ned v. State, 7 Port. 187 (error to discharge for mere failure to agree); McCauley v. State, 26 Ala. 135 (dictum—cause for discharge reviewable and if found unwarranted discharge is an acquittal); Ex parte Vincent, 43 Ala. 402 (semble: jury must be held together to end of term); per contra, In re State ex rel. Battle, 7 Ala. 259.

Now, however, the Constitution of 1901, § 9, and Code 1940, T. 30, § 100, give the trial judge discretion to discharge a jury upon failure to agree, Alford v. State, 243 Ala. 404, 10 So.2d 373; Andrews v. State, 174 Ala. 11, 56 So. 998, McClellan and Mayfield, JJ., dissenting.

It is clear that this Code section recognizes the fact that hung juries come about and our law today does not contemplate that the circuit judge shall cart them about on his itinerary from county seat to county seat till they agree. Nor are they nowadays to be kept "without meat, drink, or fire (candle-light excepted)," Winsor v.

Queen, [1866] L.R. 1 Q.B. 289, also p. 389. Under T. 30, § 97, it is provided that the county must furnish suitable lodging and meals to jurymen.

This digressive background is given to show that in these 300 years the law has moved to the viewpoint that the verdict is not the sine qua non of a trial but that we require an uncoerced deliberation even if it leads to a hung jury.

▮ The crux of the pertinent principle is that the jury not be coerced: threats such as contempt proceedings, suggestions that the majority should govern appear as examples of improper urging, Meadows v. State, 182 Ala. 51, 62 So. 737; Gidley v. State, 19 Ala.App. 113, 95 So. 330. See also Brickwood's Sackett Instr. to Juries (3d Ed.), § 93; Reid's Branson Instr. to Juries (3d Ed.), § 45; Annotations, 85 A.L.R. 1420, 109 A.L.R. 72, and 19 A.L.R.2d 1257.

▮ Yet the judge has a duty, when occasion demands, to remind the jury of their oaths (T. 30, § 58), and that agreement upon a truly unanimous (not compromise) verdict is to be sought by all proper means within the deliberative process. A jury is not a mere committee to explore and bring in majority and minority reports.

In this vein we find a long line of cases (many alluded to by Foster, J., in Bufkins v. State, 20 Ala.App. 457, 103 So. 902), of which Commonwealth v. Tuey, 8 Cush. 1, 62 Mass. 1 and Allen v. United States, 164 U. S. 492, 17 S.Ct. 154, 41 L.Ed. 528, are the forerunners. See Wolin v. United States, 4 Cir., 211 F.2d 770, for an example of the use of the Allen instruction.

Cases which tend to support the remarks of the trial judge in this appeal as to expense are: Hannon v. State, 70 Wis. 448, 36 N.W. 1 ("The county ought not to be subjected to the costs of another trial, if it can be avoided."); also Secor v. State, 118 Wis. 621, 95 N.W. 942; Johnson v. State, 60 Ark. 45, 28 S.W. 792, 793 (jury out 58 hours—"This case has been a great expense to the county * * * and it

ought to be decided; and, while I do not ask you to yield any question of conscience, you must not be obstinate * * *"); Mallory v. State, 141 Ark. 496, 217 S.W. 482, 483 (special judge—"The county ·has been put to an enormous cost in trying this case * * * and I expect to sit until you reach a verdict."); State v. Rogers, 56 Kan. 362, 43 P. 256, 257 (jury out 24 hours— "* * * a great expense to the public * * * and if you should disagree * * * all of the expense of this trial being lost, and another trial being had at the same expense * * *"); Clos v. Chapman, Ohio App., 34 N.E.2d 811, 814 (civil case— "It is very expensive to the county to re-try this case * * * I think you should keep on trying. * * * I don't want to coerce you * * *"); Roper v. Holbrook, 77 Ga.App. 686, 49 S.E.2d 558, 560 (civil case, jury out two and one-half hours—"It is expensive to the county and to the parties to declare mistrials, and I will give you gentlemen ample opportunity to reach a verdict."); McLendon v. State, 205 Ga. 55, 52 S.E.2d 294, 301 ("It is expensive to try cases and not finish them up, and you all do the best you can. You all stay together; * * *"), citing Yancy v. State, 173 Ga. 685, 160 S.E. 867; People v. Achal, 125 Cal. App. 652, 14 P.2d 773, 774 (jury out 23 hours—"It is both important to The People and the defendant that the trouble and expense and delay of a new trial be avoided, if it can be done fairly under the evidence * * *"); Suslak v. United States, 9 Cir., 213 F. 913, 919 ("* * * this is a costly case, both to the ·government and to the defendants; * * *"); Shea v. United States, 9 Cir., 260 F. 807, 808 (jury out 30 hours—"* * * this case has involved a very great expense upon the government. * * * justice to both the government and defendant requires that it be not attended with too great outlay or expense."); In re Cocklin's Estate, 232 Iowa 266, 5 N.W.2d 577, 579 (trial in 13th day, jury out 29 hours—"* * * Then there would be the delay * * * and not the least, the expense of another trial, both to the parties and the taxpayers of this county."); State

v. Anderson, 247 Minn. 469, 78 N.W.2d 320 (reversed on other grounds—jury out 17 hours—labor, expense and time entailed by another trial) ; People v. Kasem, 230 Mich. 278, 203 N.W. 135, 139 ("* * * if it had to be tried again, it would be a still greater expense to the taxpayers; * * *"—not error) ; May v. State, 98 Miss. 584, 54 So. 70 (reversed on another ground) ; State v. Seals, 135 La. 602, 65 So. 756, 757 ("You should not put the parish to the expense of another trial," *held* not coercive). See also 53 Am.Jur., Trial, § 960.

Tending to support a reversal because of reference to expense are: State v. Fisher, 23 Mont. 540, 59 P. 919, 923 ("This * * * is an expensive case for the county to try, and it is not a case where the jury ought to disagree * * *," *held* improper, *sed quaere* as to reversible error.) ; State v. Chambers, 9 Idaho 673, 75 P. 274, 276 (jury out 23 hours— " * * * these things are very expensive to the county * * *" —after 30 hours— " * * * The administration of justice * * * demands it. These trials are expensive," *held* expense is an extraneous consideration and hence instruction error to reversal), citing State v. Bybee, 17 Kan. 462 ; State v. Ivanhoe, 35 Or. 150, 57 P. 317 ; Randolph v. Lampkin, 90 Ky. 551, 14 S.W. 538, 10 L.R.A. 87; State v. Fisher, supra; People v. Kindleberger, 100 Cal. 367, 34 P. 852 ; People v. Sheldon, 156 N.Y. 268, 50 N.E. 840, 41 L.R.A. 644 ; State v. Clark, 38 Nev. 304, 149 P. 185, 186 (jury out "several hours" —"The trial * * * 'has cost Humboldt county a vast sum of money' * * *," held remarks—coupled with jury being 11–1 and judge's further remark, "It looks easy," when in fact evidence was balanced—constituted reversible error), citing Burton v. United States, 196 U.S. 283, 25 S.Ct. 243, 49 L.Ed. 482, and Peterson v. United States, 9 Cir., 213 F. 920 ; Gaddy v. Harmon, 191 Ga. 563, 13 S.E.2d 357, 358 (civil case—jury out 18 hours—requested clarifying instructions which contained irrelevant matter —" * * * this case * * * has been tried at great expense to both sides * *,"

verdict returned in five minutes, *held* erroneous charge and urging combined to make error) ; Counts v. Commonwealth, 137 Va. 744, 119 S.E. 79, 80 ("* * * nine are more apt to be right than three * * *," *held* error) ; State v. Olson, 159 Minn. 415, 199 N.W. 1 (language not given) ; Decker v. Schumacher, 312 Mich. 6, 19 N.W.2d 466, 467 (Sup.Ct. en banc: civil case—jury out 30 hours—"We have agreed to disagree." "*You can't do that. That isn't a verdict* * * **"** "There must be either five or seven contrary people on this jury." Later: "I look to see cases go over the term pretty fast unless you do agree because attorneys can't afford to spend the time and expense of trying cases before juries that will not arrive at verdicts * * *," *held* coercive). (Italics supplied.)

The charge must be examined so that the suspected language is tested in the whole context of its setting, Whittle v. State, 205 Ala. 639, 89 So. 43. Yet the exhortation has been held not to be a direction on the law of the case: its source is the inherent power of the trial judge as the governor of the trial. Ashford v. McKee, 183 Ala. 620, 62 So. 879 ; Rutledge v. Brilliant Coal Co., 247 Ala. 40, 22 So.2d 428 (dictum). In this area the remarks of the court must be couched in most cautious terms avoiding the slightest overtone of belief in guilt. Lagrone v. State, 84 Tex. Cr.R. 609, 209 S.W. 411 ; Counts v. Commonwealth, 137 Va. 744, 119 S.E. 79.

" * * * Majority verdicts are not in keeping with the ideals of our justice, and in the constitutional convention of 1901 the effort to provide for majority verdicts even in civil trials was overwhelmingly condemned. The province of the trial judge is to charge the law, and in doing so should not by word or deed have the least appearance of duress or coercion. Phoenix Ins. Co. v. Moog, 81 Ala. [335] 343, 1 So. 108. * * *" Gidley v. State, supra [19 Ala.App. 113, 95 So. 331].

Aside from the reference to the taxpayers (a class now so numerous that it could be said to include virtually everyone, see Koons v. Board of Commissioners of Atlantic City, 134 N.J.L. 329, 47 A.2d 589), we conclude that the reading of the entire context of the verdict-urging instruction here must be considered coercive, particularly because of the use of the expression, "This court *expects* a verdict," and the further use of the word "expect" in "so the taxpayers of the county *expect* a verdict, not an exhibition of obstinancy." (Italics supplied.)

The word "expect" often carries a connotation of more than merely waiting for. Thus, in Webster's New International Dictionary, 2d Ed., in discussing the synonyms "expect," "anticipate," and "hope," the text says: *"Expect* is the strongest, and implies some ground or reason in the mind for considering the event as likely to happen; * * *" Nelson's order of the day at Trafalgar, "England *expects* every man to do his duty," would have been reduced to pusillanimous pap had the Admiral said, "England hopes * * *." (Italics supplied.)

It is obvious from reviewing the above authorities that while there is agreement among all courts as to the abstract general principle that a jury verdict should be uncoerced and induced only by the evidence presented in the trial and the inferences which logically flow therefrom, nevertheless the great divergence in the application of the principle to various factual situations in which the error is claimed has caused some courts to find error in reference to the expense of trial.

And while there are cases such as Campbell v. State, 81 Ga.App. 834, 60 S.E.2d 169, which hold that the consideration of the time and expense of a retrial is reference to an extraneous matter not in evidence, there are, on the other hand, cases of opposite conclusions, such as People v. Kasem, supra, where the judge, on three separate occasions during the jury's delib-

eration, referred to the expense to the county or "to the taxpayers," the court in holding this reference not to constitute reversible error had occasion to say:

"In several of the cases hereafter cited allusion is made to the fact that such an instruction is quite as favorable to the defendant as to the prosecution. If it be claimed that one or more jurors who are unwilling to agree with their fellows are influenced thereby and yield their convictions, they are quite as likely to be jurors holding out for conviction as for acquittal. The jurors are, of course, aware that criminal trials are expensive, and that the taxpayers of the county must bear the expense. What was said by the court was but a reminder of what they themselves well knew. It was their duty to agree, if possible, and, after many hours of further deliberation, they did agree. The court in no way intimated to them his opinion as to the verdict they should render. While what was said might better have been omitted, we are forced to the conclusion that, in view of their after discussion, it but induced them to reconsider the testimony and the instructions of the court, perhaps more fairly and with a consciousness that their differences of opinion should be reconciled, if possible, without the abandonment of a fixed conviction on the part of any juror.

"In considering such questions, we are apt to lose sight of the fact that jurors are men of intelligence. They fully understand that they are not mere automatons, charged with the duty of voicing the sentiments or desires of the trial court. The majority, if not all of them, have a proper conception of their own duty, and of the duty of the court, and will not be driven to return a hasty or unjust verdict because they might think it in accord with the wishes of the court. Instructions, urging agreement if the jurors could conscien-

tiously do so, and stating that absolute certainty that their verdict was right could not be expected, were approved of in Commonwealth v. Tuey, [8 Cush. 1, 62] Mass. 1; State v. Smith, 49 Conn. 376, and Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528."

Apparently, this state of confusion which is visited upon us is not an experience unique to ourselves, for we find in United States v. Samuel Dunkel & Co., 2 Cir., 173 F.2d 506, 509, Judge Clark, speaking for a court consisting of himself, L. Hand, Ch. J., and Swan, J., saying:

"The issue of coercion of the jury presented by such an inquiry is one which has divided the federal courts; but it now appears to have been settled by the Supreme Court. In the first of two important cases, Burton v. United States, 196 U.S. 283, 305, 308, 25 S.Ct. 243, 249, 49 L.Ed. 482, the trial judge, before giving the Allen charge, had inquired of the jury reporting a disagreement as to their numerical division, but not as to 'how many stand for conviction, or how many for acquittal.' The foreman had then stated that the jury stood eleven to one. The Supreme Court, after ordering reversal of the judgment below on other grounds, went on to criticize the practice of inquiring as to the proportion of division of the jury, even without the inquiry as to which way the division might be. Stating that this knowledge was not material, since the judge could have made his charge admonishing the jury to make honest endeavors to agree without asking for the information, the opinion continued: '* * * we do not think that the proper administration of the law requires such knowledge or permits such a question on the part of the presiding judge. Cases may easily be imagined where a practice of this kind might lead to improper influences, and for this reason it ought not to obtain.'

"After this decision the lower courts divided as to whether the Court's remarks were merely hortatory or whether the criticized inquiry constituted reversible error, and the Supreme Court in the later case of Brasfield v. United States, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345, granted certiorari for the purpose of resolving the conflict. Since here the United States has suggested that the conviction may be sustained because the exact numerical division of the jury was not asked for or divulged, it is important to note the cases cited by the Court as disclosing the conflict. On the one side were cases from the Eighth Circuit reversing convictions for such inquiries preceding the Allen charge. While in one of the cases cited, the exact proportion was elicited, St. Louis & S. F. R. Co. v. Bishard, 8 Cir., 147 F. 496, 500, and see also Weiderman v. United States, 8 Cir., 10 F.2d 745, yet in the other two it was not. Stewart v. United States, supra, 8 Cir., 300 F. 769, 782, where the inquiry was 'whether the jury was evenly divided, or whether there was a larger preponderance one way or the other,' and Nigro v. United States, 8 Cir., 4 F.2d 781, 783, where the judge asked the foreman 'without indicating how the jury stood in numbers' to state 'whether or not there was a predominance' and the foreman said that there was. In the cases cited to the other view the numerical division was elicited. In Bernal v. United States, 5 Cir., 241 F. 339, 342, one judge dissenting, certiorari denied 245 U.S. 672, 38 S.Ct. 192, 62 L.Ed. 540, the conviction was sustained without citation of precedents. In Quong Duck v. United States, 9 Cir., 293 F. 563, the inquiry was held not ground of error in itself, but error was found because of what the court denominated coercive language in the supplemental charge.

"It is against this background that the decision in Brasfield v. United

States, supra, 272 U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed. 345, was made with the express intention of settling the law. It ordered a reversal of a conviction because the trial judge had inquired how the jury was divided numerically and was informed by the foreman that it stood nine to three. * * *

\* \* \* \* \* \*

"We are bound to say that we do not feel happy over the result, for here the defendants appear to have had the benefit of the most careful deliberation by the jury and it is certainly doubtful whether in fact the judge's remarks may have had any effect in restricting or controlling that deliberation. Here was a long and difficult trial, where the evidence of guilt was substantial, now upset after a seven weeks' effort for this one perhaps doubtful slip. The defendants, out on bail, have already had the benefit of extreme delay in making up the record and preparing the appeal. This case does not make for seemly law administration. But the federal precedents are compelling and we would hardly improve the situation by trying to introduce into the system refined distinctions lacking substance. * * * *"

While most of the Federal cases follow somewhat the theory behind the Texas cases relating to a trial judge attempting to ascertain the standing of the jury (Womack v. State, 117 Tex.Cr.R. 346, 35 S.W.2d 723; Rogers v. State, 118 Tex.Cr. R. 123, 38 S.W.2d 784; Golden v. State, 89 Tex.Cr.R. 525, 232 S.W. 813; Pullen v. State, 121 Tex.Cr.R. 619, 51 S.W.2d 592), yet they also bring out that the principal concern of the appellate court should be to ascertain whether or not the trial judge's language is susceptible of conveying any suspicion that he expects a conviction. Thus, in State v. Nelson, 63 N.M. 428, 321 P.2d 202, where the foreman of the jury indicated a division of eleven to one, it was error for the court to give a "shotgun"

instruction, the tenor of which could be considered as directed solely to the single juror holding out for acquittal.

Reverting to the underlying rule, we quote from a quasi-criminal case, In re Stern, 11 N.J. 584, 95 A.2d 593, 594, where the trial judge had remarked:

"'Members of the Jury, you realize you have been trying to arrive at a verdict since 11:20 this morning, but we have been here two and a half days and the Court would appreciate it if you could see if you can arrive at a verdict, and therefore asks if you will not go back to the jury room, and the Court is willing to remain here until you arrive at a verdict. You, I am sure, realize that we have been here trying the case hoping to arrive at a verdict. It costs a lot of money to the state to maintain the court, and if you cannot arrive at a verdict it means that it will probably have to be retried which will take several days. See if you cannot arrive at a verdict. You may return to the jury room.'"

The opinion of Heher, J., speaking for a 5–2 court, continues:

"* * * The judge did not inquire into the matters which were the subject of disagreement with a view of further instructions designed to clarify the issue and enlighten the jury for the fulfillment of its essential function. The sole ground urged for resolving the differences was the financial burden a retrial would lay upon the State, and the immediate return of the verdict bespeaks an expedient surrender by one or more of the jurors of convictions entertained after more than five hours of discussion and deliberation. The denial to the alleged incompetent of the substance of the right of trial by jury is a compelling inference and the judgment is accordingly not sustainable.

"Although allowable at the early common law, coercion of a jury is not

.permissible in any degree under our constitutional system of judicial administration. The resolution of the facts is the exclusive province of the jury, and an invasion of the independence of that tribunal vitiates the verdict."

The use of the words "expect a verdict," coupled with a reference to obstinacy, in our opinion, can be interpreted as urging conviction; and, for this error, the case must be reversed and remanded.

Reversed and remanded.

### On Application for Rehearing

The record here shows:

"The defendant excepts to that portion of his Honor's Charge commencing with 'this court expects a verdict in this case' and continuing with 'it cost the tax-payers money, etc.' "

■ This reference was not merely topical and hence not too indefinite within the illustrations given in Robinson v. State, 38 Ala.App. 315, 82 So.2d 815. We distinguish the illustration given in Cantor v. State, 27 Ala.App. 40, 165 So. 597, in that here counsel quoted the gist or substance—"this court expects a verdict in this case." The reason for our rule that the exception be specific is to allow the judge to correct his error, if any, and to do so his approximate language should be quoted to him.

■ Moreover, the remarks of the court do not come under the category of instructions on the law of the case, and hence the rule as to exception does not apply, Meadows v. State, 182 Ala. 51, 62 So. 737. In Gidley v. State, 19 Ala.App. 113, 95 So. 330, it was sufficient merely to say, "I reserve an exception to your honor's statements."

The Attorney General cites us Moore v. City of Platteville, 78 Wis. 644, 47 N.W. 1055, Odette v. State, 90 Wis. 258, 62 N.W. 1054, State v. Price, 30 S.D. 299, 138 N.W.

14, and German Savings Bank of Davenport v. Citizens' National Bank, 101 Iowa 530, 70 N.W. 769, 63 Am.St.Rep. 399.

Moore and Price are cases (as is also Spick v. State, 140 Wis. 104, 121 N.W. 664) in which the trial judges stated they expected verdicts. The German Savings Bank of Davenport case language was, "This case is submitted to you for decision, and not for disagreement."

However, in Hodges v. O'Brien, 113 Wis. 97, 88 N.W. 901, the cause was reversed because the appellate court considered the trial judge had overemphasized the expense of another trial to the parties, the attorneys and the county.

■ The Alabama rule on verdict urging is based on potentiality—"the least appearance of duress or coercion." Phoenix Ins. Co. v. Moog, 81 Ala. 335, 1 So. 108, 115; De Jarnette v. Cox, 128 Ala. 518, 29 So. 618; Meadows v. State, supra; Holladay v. State, 20 Ala.App. 76, 101 So. 86; Gidley v. State, supra.

In the instant case, we have a conjunction of (1) a spontaneous communication by the court to the jury at the beginning of a court day, apparently following deliberations by the jury on the prior afternoon for some three or four hours, (2) an emphasis on the public expense, (3) a statement that the court expects a verdict, (4) a statement that the taxpayers (a term which could also mean the "people") expect a verdict, and (5) a statement that the taxpayers do not expect an exhibition of obstinacy.

True, any one of these singly and apart in another context might be free of prejudicial tendencies, but taken together we consider them to present the appearance—though unintended—of coercion. Gidley v. State, supra; Holladay v. State, supra.

Application overruled.